UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| WELLS FARGO BANK, N.A.,<br><br>      Plaintiff,<br><br>v.<br><br>LaSALLE BANK NATIONAL ASSOCIATION,<br><br>      Defendant. | 2:08-CV-1448 JCM (RJJ) |

**ORDER**

Presently before the court is plaintiff Wells Fargo Bank N.A.'s motion to exclude certain portions of the expert report of Timothy Dwyer and his related testimony. (Doc. #112). Defendant LaSalle National Association filed an opposition. (Doc. #127). Plaintiff filed a reply. (Doc. #142).

The present case arises out of an alleged breach of representations and warranties relating to fourteen mortgage loans secured by a single building in a 15-building multi-family complex in Las Vegas. Defendant LaSalle originated the loans through its multifamily finance group program (hereinafter "MFG Program") for securitization and sale. The loans were securitized as part of LaSalle's commercial mortgage pass through certificates, series 2006-MF2 (hereinafter "MF2"). Plaintiff Wells Fargo is the trustee for the certificateholders. The mortgage loans were sold on March 30, 2006, pursuant to a Mortgage Loan Purchase Agreement (hereinafter "purchase agreement").

In the plaintiff's complaint, it asserts that LaSalle breached the following representations and warranties within the purchase agreement:

**James C. Mahan**
**U.S. District Judge**

1      (1) The Loans were originated and serviced in accordance with customary

2         industry standards;

3      (2) LaSalle had no actual knowledge of any misrepresentations or

4  omissions

5         contained in the documents furnished in connection with any of the

6  Loans;

7      (3) To LaSalle's knowledge, no person other than the related mortgagor

8  and

9         the mortgagee own any interest in any payments due under the leases

10        related to the mortgaged property;

11     (4) The loan documents securing the mortgages were not in default; and

12     (5) The appraisals conducted in connection with the Loans complied with

13        FIRREA.

14 In asserting that all five representations were not in fact breached, and even if they

15 were, the breach did not have a material and adverse effect, defendants provide the expert

16 report of Timothy Dwyer. It is undisputed that Mr. Dwyer has twenty-five years experience

17 in banking and related industries, and that he is qualified to opine regarding the customary

18 industry standards relating to representation 23. However, in plaintiff's motion to exclude his

19 testimony (doc. #112), it asserts that Mr. Dwyer's report and testimony suffers from two flaws

20 relating to other issues; (1) his lack of experience and qualifications, and (2) his attempt to

21 opine on topics that are not appropriate for experts to testify about.

22 More specifically, plaintiff asserts that Mr. Dwyer has "**never had an occasion to**

23 **read FIRREA before this lawsuit**," which is a requisite to opine regarding representation

24 35, and is "solely relying on the opinions of [] other experts." (Doc. #112) (emphasis

25 supplied). Moreover, plaintiff asserts that Mr. Dwyer's opinions relating to representations

26 6 and 6(a)(viii) should be excluded because they improperly consist of his interpretation of

27 relevant contractual provisions. Further, plaintiff challenges the reliability and relevancy of

28

**James C. Mahan**
**U.S. District Judge**

- 2 -

a chart that purports to analyze the delinquency rates of the MF2 securitizations, and asserts that since Mr. Dwyer is unable to explain significant aspects of the chart, he should be excluded from doing so.

**The Daubert Standard/ Rule 702**

Pursuant to Federal Rule of Evidence 702,

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact at issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

An expert's testimony is admissible only if (1) the expert is qualified, (2) his opinion is reliable, and (3) if his testimony is relevant and will assist the trier of fact. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588-595 (1993); *General Electric Co. v. Joiner*, 522 U.S. 136 (1997); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999); *Primiano v. Cook*, 2010 WL 1660303, *3, _F.3d_ (9th Cir. 2010); *Morin v. United States*, 534 F.Supp.2d at 1184, 1187 (D. Nev. 2005).

First, to determine if the expert is qualified, the court should consider "the expert's particular expertise, and the subject of his testimony." *Kumho*, 526 at 147. Next, the court must "determine whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology can be applied to the facts in issue." *Butler,* 984 F. Supp. at 1257, 1259. (*citing Duabert,* 509 U.S. at 592-93). Further, plaintiff asserts that the court should undertake "a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and the methods to the case at hand." *Neal-Lomax v. Las Vegas Metropolitan Police Dept.*, 574 F. Supp.2d 1193, 1202 (D. Nev. 2008) (*citing Kumho*, 526 U.S. at 152).

Finally, in deciding if an expert's testimony will assist the trier of fact, the court looks

at whether the testimony is relevant, whether it is within the juror's common knowledge and experience, and whether it will usurp the juror's role of evaluating a witnesses' credibility. *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000).

**Mr. Dwyer's Opinion: Breach of Representation 35**

Plaintiff asserts that Mr. Dwyer is purporting to opine that representation 35 was not breached because the appraisals prepared in connection with the loans complied with the guidelines set forth in FIRREA and the Uniform Standards of Professional Appraisal Practice[1] (hereinafter "USPAP"). However, plaintiff asks this court exclude this testimony because he is not qualified to testify regarding FIRREA compliance and he admits that he is relying on the opinions of other experts regarding FIRREA.

  **1. FIRREA and USPAP Experience**

Plaintiff asserts that despite his 25 years of experience in the context of making loans, Mr. Dwyer admits that he never reviewed an appraisal to determine whether the appraisal satisfies USPAP or FIRREA, does not consider himself an expert on FIRREA regulations pertaining to appraiser independence, and prior to this case, he never had an occasion to interpret the FIRREA regulations nor provide an opinion regarding whether any appraisal complied with USPAP and FIRREA (doc. #112-3).

Wells Fargo insists that due to his lack of experience and expertise on FIRREA compliance, he is unqualified to opine on this matter and fails to satisfy the requirements of rule 702. *Kumho*, 526 at 147; Federal Rule of Evidence 702. Defendant LaSalle asserts that Mr. Dwyer's opinion will be limited to the issue of "whether, assuming a breach [], the breach was material and had the requisite material and adverse effect," and that, as such, he is not purporting the opine regarding FIRREA compliance.

However, the defendant's assertion is directly contradicted by Mr. Dwyer's report, where he states that he has "been asked to review and opine on [the issue of] [w]as there a

---

[1] FIRREA requires compliance with USPAP as it relates to the loans at issue. *See* 12 U.S.C. § 3339.

1 breach?" (Doc. #112-5). It is further contradicted in his report where he discusses what he believes FIRREA and USPAP requires, and concludes "it is [his] opinion that there was no breach of USPAP, FIRREA, or [s]ection 35..." *Id.*

### 2. Reliance on Other Expert's Opinions

More concerning to the court, is the contention that Mr. Dwyer is solely relying on the opinions of other experts to reach his conclusions regarding FIRREA compliance. Specifically, as plaintiff points out, Mr. Dwyer admitted in his deposition that he is "relying on other experts with respect to the FIRREA issue" because, as he had mentioned previously, [he is] not a FIRREA or USPAP expert," and had never before opined regarding this issue. (Doc. #112-3).

As courts have repeatedly held, and can be implied from rule 702, an expert cannot merely base his opinions upon the opinions of others without having an independent basis for his opinion. *United States v. 99.66 Acres of Land*, 970 F.2d 651, 567 (9th Cir. 1992); *6816.5 Acres of Land, Etc., Rio Arriba Co., N.M. v. United States*, 411 F.2d 834, 839-40 (10th Cir. 1969); *American Key Corp. v. Cole Nat. Corp.*, 762 F.2d 1569, 1580 (11th Cir. 1985); Federal Rule of Evidence 702.

Thus, as Mr. Dwyer is in fact purporting to testify as to whether FIRREA and USPAP were complied with, and merely derives at his conclusions by relying on the opinions of others, his testimony and report are excluded with regards to this issue. Mr. Dwyer may present his opinions regarding the materiality of the breach if any, but not *if* the loans complied with FIRREA and USPAP.

### Mr. Dwyer's Opinion: Representation 6(a)(viii)

In the motion to exclude his testimony (doc. #112), plaintiff asserts that Mr. Dwyer's report and testimony regarding representation 6(a)(xii) should be excluded because he is opining as to his *interpretation* of the PSA and its contractual affect on representation 6(a)(vii), which is inappropriate for an expert to testify to.

Unless a contract is deemed ambiguous or there is a term of the contract that requires

an expert's explanation, it is improper for an expert to interpret or construe a contract in his opinion. *McHugh v. United Serv. Auto. Ass'n*, 164 F.3d 451, 454 (9th Cir. 1999) (holding that "although experts may disagree in their conclusions; their testimony cannot be used to provide legal meaning or interpret the policies as written."). Such matters of law are "inappropriate subjects for expert testimony." *Aguilar v. Int'l Longshoremen's Union Local No. 10*, 966 F.2d 443, 447 (9th Cir. 1992).

Here, neither party has alleged that the terms of the contract or the contract itself is ambiguous. Representation 6(a)(viii) clearly states that the seller:

> [H]as no actual knowledge that any statement, report, officer's certificate or other document prepared and furnished or to be furnished by the Seller in connection with the transactions . . . contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained therein, in the light of the circumstances under which they were made, not misleading. (Ex. 10, purchase agreement Section 6(a)(viii)).

However, Mr. Dwyer opines that "regardless of whether LaSalle was aware of the borrower's misrepresentations and omissions made in connection with the transactions at issue, LaSalle exculpated itself from any liability on this basis pursuant to section 2.01 of the [pooling and servicing agreement]." (Doc. #112-5). Further, he provides the opinion that plaintiff "has no contractual basis for making a claim for breach of this representation based on his "interpretation" of the appropriate sections of the PSA. Plaintiff asserts that this opinion is an interpretation of the contract, and is inadmissible.

Defendant rebuts this argument, by arguing that Mr. Dwyer is simply opining "regarding the *customary industry practice* regarding the transfer of rights from a loan seller to a securitization trustee and, applying those principles here, that [p]laintiff has no contractual basis for claiming a breach [] because the PSA explicitly excludes [the] section from the transfer of rights to the trustee." (Emphasis added).

However, this court is unaware, and defendant has failed to demonstrate, how the *customary industry practice* is relevant to interpreting the purchase agreement with respect to representation 6(a)(viii). Furthermore, Mr. Dwyer does not refer to any industry practices

1  or customs in the section of his report regarding a breach of 6(a)(vii), as he does in other

2  sections, such as the section regarding representation 23 (doc. #112-5). More importantly, as

3  Mr. Dwyer's report interprets the contract and its specific provisions, and gives an opinion

4  based on this interpretation, it is an "inappropriate subject[] for expert testimony" and is

5  excluded. *McHugh* , 164 F.3d at 451, 454; *Aguilar*, 966 F.2d at 443, 447.

6  **Mr. Dwyer's Opinion: Representation 6**

7      Plaintiff next asserts that Mr. Dwyer's opinion should be excluded with regards to

8  representation 6, due to the fact that he opines regarding his legal interpretation of the

9  parameters of representation 6[2]. Section 6 of the purchase agreement provides that;

> Each Mortgage Loan is secured by the related Mortgage which establishes and creates a valid and subsisting first priority lien on the related Mortgaged Property, or leasehold interest therein, comprising real estate, free and clear of any liens, claims, encumbrances, participation interests, pledges, charges or security interests subject only to Permitted Encumbrances. Such Mortgage establishes and creates a first priority security interest in favor of the Seller in all personal property owned by the Mortgagor that is used in, and is reasonably necessary to, the operation of the related Mortgaged Property. There exists with respect to such Mortgaged Property an assignment of leases and rents provision, either as part of the related Mortgage or as a separate document or instrument, which establishes and creates a first priority security interest in and to leases and rents arising in respect of the related Mortgaged Property, subject only to Permitted Encumbrances. To the Seller's knowledge, no person other than the related Mortgagor and mortgagee own any interest in any payments due under the related leases.

    Plaintiff asserts that when Mr. Dwyer opines in his report that after considering the phrase "[t]here exists with respect to such [m]ortgaged [p]roperty an assignment of leases and rents provisions . . . which establishes and creates a first priority security interest" he concludes that Rep 6 only speaks to "whether, upon default, the [l]ender has a clear first priority security interest in and to leases and rents arising in respect of the related Mortgaged Property," he is testifying as to how the contract should be construed.

    Defendant LaSalle once again asserts that Mr. Dwyer is purporting to opine regarding

---

[2] Plaintiff, however, does not seek to exclude Mr. Dwyer's opinion as to whether representation 6 was breached or the materiality of any alleged breach.

**James C. Mahan**
**U.S. District Judge**

- 7 -

the fact that it is "customary in the industry" that the purpose of a representation along the lines of representation 6 is to "confirm the existence of a valid assignment and security interest in the rents." Unlike in the representation previously discussed, Mr. Dwyer's report regarding representation 6 does mention what is *customary in the industry.* As this is not a legal conclusion nor interpretation of the contract, but merely an opinion of what is customarily done in contracts, the court is inclined to allow this testimony.

However, as Mr. Dwyer is also providing his interpretation of the contract and explaining how plaintiff's interpretation of the representation was in "error as well"(doc. #112-5), such testimony is inappropriate and excluded. *McHugh*, 164 F.3d at 451, 454; *Aguilar*, 966 F.2d at 443, 447.

**Mr. Dwyer's Chart of MF2 Securitization**

With regards to representation 23, Mr. Dwyer concludes that "MF2 had delinquency rates above the industry mean" but that "the differences were not material." (Doc. #112-12). To support this conclusion, he relies on a chart that was created by his analyst. (Doc. #112-13). Plaintiff asserts that this chart and his accompanying testimony should be excluded because Mr. Dwyer could not explain underlying data used to create it, and that the explanation he could provide reveals that the chart is "completely unreliable and does not represent a relevant comparison to the [m]ortgage [l]oans at issue."

    1.    Mr. Dwyer's Ability to Opine on the Validity of the Data

As previously stated, the court must "determine whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology can be applied to the facts in issue." *Butler,* 984 F. Supp. at 1257, 1259. (*citing Duabert,* 509 U.S. at 592-93). Here, plaintiff relies on the court in *Valentine v. Pioneer Chlor Alkali Co., Inc.,* 921 F. Supp. 666, 669 (D. Nev. 1996) (*quoting Daubert II,* 43 F.3d at 1316), in asserting that Mr. Dwyer must be able to explain the chart in order to certify the statistical validity and give an opinion predicated on the result.

Plaintiff asserts that Mr. Dwyer could not explain critical aspects of the chart, such as

1  (1) what types of loans were used, (2) what loan amounts were included in the population
2  making up the "industry" portrayed, (3) the dollar amounts of the loans, (4) why the upper and
3  lower limits of the chart's "standard deviation" vary on different dates, and (5) why the chart
4  starts on January 1, 2004, when the MF2 securitization at issue did not close until March 30,
5  2006. (Doc. #112-3).

It is plaintiff's position that since Mr. Dwyer is simply "reading the [c]hart," and is "unqualified to explain what the data means or to opine on the statistical validity of the results," his chart and accompanying testimony are "virtually meaningless." *Brown v. Am. Honda Motor Co.*, 939 F.2d 946, 952 (11th Cir. 1991).

Defendant asserts that any issue with regards to the "methodology" and underlying data of the chart goes to the weight of the testimony and not to its admissibility. Further, it asserts that Mr. Dwyer's inability to answer a few questions does not indicate that he is not qualified to opine on the chart or draw conclusions from it, but rather that it "reflects that he had an analyst assist him." Moreover, defendant insists that Mr. Dwyer was in fact able to answer many questions in his deposition about his analysis, including "his instructions to [the analyst], the purpose of the chart, what conclusions to draw from it[,] the source of the underlying data," "how he determined what securitizations to include...and why a variety of types of small balance loans were included."

The court agrees with defendant, that his inability to answer certain questions regarding the chart goes to the weight and credibility of his testimony, and not to the admissibility of it. *Kennedy v. Collagen Corp.,* 161 F.3d 1226, 1231 (9th Cir. 1998). Thus, the court is not inclined to exclude the chart on these grounds.

**2.    The Chart's Reliability**

In addition to attacking Mr. Dwyer's ability to opine regarding the chart, plaintiff asserts that the chart itself is completely unreliable. Specifically, plaintiff states that the main problem with the chart is that "it compares the MF2 securitization with securitizations that included a wide range of commercial loans secured by various property types, including

1  rental, office, small industrial, mixed-use residential, mobile homes, multifamily and other
2  commercial properties." (Doc. #112-3). Further, plaintiff asserts that Mr. Dwyer's own
3  testimony supports the exclusion of the chart, as he agreed in his deposition that "default rates
4  for different collateral types are going to be different," and admitted that multifamily loans
5  tend to have a lower delinquency rate.

6  Moreover, plaintiff asserts that the dates used in the chart make it unreliable because
7  it includes loans that were closed in 1996, when the loans at issue didn't close until ten years
8  later 2006. Finally, plaintiff asks this court to exclude the chart because it does not "fit the
9  present case," as it mixes in loans secured by collateral known to have higher default rates
10 and, due to the dates used, is "utterly confusing" to the jury. Plaintiff asserts that this sort of
11 manipulation of the data makes the chart unreliable.

12 Defendant LaSalle argues that "criticism of the comparables used by Mr. Dwyer goes
13 to weight and not admissibility" of his opinions. However, the court is concerned with the
14 misleading nature of the chart. Thus, the court is inclined to exclude the chart as defendant
15 does not demonstrate the chart's reliability nor rebut the argument that it is based on selective
16 data used to distort the chart's conclusion.

17 Accordingly,

18 IT IS HEREBY ORDERED ADJUDGED AND DECREED that plaintiff Wells Fargo
19 Bank N.A.'s motion to exclude certain portions of the expert report of Timothy Dwyer and
20 his related testimony (doc. #112) be, and the same hereby is, GRANTED in part and DENIED
21 in part.

22 . . .
23 . . .
24 . . .
25 . . .
26 . . .
27 . . .
28

**James C. Mahan**
**U.S. District Judge**

**James C. Mahan**
**U.S. District Judge**

1    IT IS THEREFORE ORDERED that Mr. Dwyer's testimony as to whether FIRREA
2  and USPAP were complied with, Mr. Dwyer's report interpreting representation 6 (a)(viii)
3  of the contract, the section of Mr. Dwyer's report where he is providing his interpretation of
4  representation 6, and the chart demonstrating the MF2 securitization be, and the same hereby
5  are, EXCLUDED.

6    DATED February 23, 2011.

            *[signature: James C. Mahan]*
            **UNITED STATES DISTRICT JUDGE**